UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RICHARD R. JACKSON, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 4:11-CV-1061 (CEJ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On May 29, 2008, plaintiff Richard Jackson filed an application[1] for disability insurance benefits, Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of November 1, 2006. (Tr. 78-84).[2] After plaintiff's application was denied on initial consideration (Tr. 47-52), he requested a hearing from an Administrative Law Judge (ALJ) (Tr. 53-54).

Plaintiff appeared for a hearing on November 30, 2009. (Tr. 16-36). The ALJ issued a decision denying plaintiff's claims on December 22, 2009 (Tr. 5-15), and the Appeals Council denied plaintiff's request for review on April 8, 2011. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1]Plaintiff was awarded disability benefits in 1993. (Tr. 41). He subsequently returned to work and his disability was terminated. The Social Security Administration determined that plaintiff had received an overpayment for the period of May 2000 through May 2004. (Tr. 41-44). An ALJ determined that plaintiff was without fault with regard to this period of overpayment and waived recovery. (Tr. 43-44).

[2]Plaintiff subsequently amended the alleged date of onset to April 8, 2009. (Tr. 104).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 191-99), plaintiff listed his disabling conditions as a learning disorder and hyperactivity. He stated that his conditions limited his ability to work in that he had poor communication skills and was unable to focus. In addition, he had "listening problems" and did not carry out orders. He was impulsive, talked incessantly and interrupted others. He dropped things and had illegible handwriting. (Tr. 192). His longest held job was as a stocker in a retail setting from January 1997 to February 2006. (Tr. 193). He had last worked on March 13, 2008. An agency interviewer met with plaintiff and his mother and noted that plaintiff had difficulty with concentration, understanding, and answering. (Tr. 189). In addition, plaintiff "seemed easily frustrated and [did] not fully understand the nature of some of the questions being asked" and displayed "somewhat aggressive" behavior toward his mother. Id.

Plaintiff and his mother completed a Function Report (Tr. 209-20). They described his symptoms as a lack of coordination, short attention span, and constant verbalizing "(mostly negative uncalled-for comments)." In addition, he had a poor driving record with the result that he did not have a car. His socially-inappropriate behaviors included swearing and unspecified antisocial conduct. His symptoms were made worse by large assignments, crowds, paper work, and having to follow a lot of commands at one time. He had been prescribed Effexor on a trial basis but was unable to tolerate the side effects. He lived alone in an apartment and received his mother's assistance in paying bills, using a checkbook, and counting change. He was able to complete household chores, shop, and prepare simple meals. He listed swimming as a hobby and stated that he was able to watch television without difficulty. He read the

newspaper, although he had difficulty with comprehension.  Plaintiff's mother indicated that he did not get along well with other employees, bosses or anyone in authority, and that he "thinks he is perfect."

### B.  Hearing on November 30, 2009

At the time of the hearing, plaintiff was 43 years old.  He lived alone in an apartment in a complex.  (Tr. 20, 31).  He had attended one year of college during which he received special accommodations such as extra time to take tests and complete assignments.  He had a current driver's license.  (Tr. 30).  He had previously held a commercial driver's license and had once driven an armored car but his employer felt that he was not suitable for the position.  (Tr. 32-33).

Plaintiff testified that he last worked the night shift at a Wal-Mart store stocking shelves.  He was terminated after about six months because he was too slow and did not concentrate.  (Tr. 22-23).  Before that he had worked for about a month at a transmission shop filling parts orders and making deliveries.  He was terminated because he did not fill orders correctly and drove erratically.  (Tr. 24).  Plaintiff worked for six years unloading trailers and stocking shelves at a Target store.  He testified that he received special accommodations – for instance, he stocked goods that did not require him to look up bar codes.  Eventually, however, his managers decided that he was too slow and he was terminated.  (Tr. 25-26).  Plaintiff described a number of other short-term positions he had held with the U.S. Census Bureau, a consumer research company, a pool company, and others.  He opined that employers did not keep him on because he did not always get along with fellow employees and he had a "smart mouth."  Plaintiff testified that he went to a movie or out to eat with a friend about once a week and went to church services.  Plaintiff testified that he did not have

any physical problems that prevented him from working. (Tr. 30). He is able to cook and clean, go grocery shopping, and do laundry.

Plaintiff's mother, Jacqueline Jackson, testified that plaintiff had job coaches from Vocational Rehabilitation when he worked at Target. (Tr. 34). Initially, he had a supervisor who was very willing to work with people with disabilities. Plaintiff was assigned to a night shift so that he did not have to interact with customers and could work somewhat independently. His subsequent supervisor was not willing to provide the same accommodations and plaintiff lost his job because he did not follow directions. Ms. Jackson stated that the termination paperwork described plaintiff as argumentative, uncoordinated, and immature. Ms. Jackson heard reports that plaintiff had similar problems when he worked at Wal-Mart. (Tr. 35).

### C. Records

Plaintiff was evaluated by the Special School District Evaluation Clinic in October 1976 when he was in the fifth grade. (Tr. 110-17). His scores on the Weschler Intelligence Scale for Children (Revised) (WISC-R) were as follows: Verbal IQ of 98, a Performance IQ of 114, and a Full Scale IQ of 105.[3] It was noted that his short-term visual memory abilities were adequate at only a very basic level and the integration of auditory and visual perception and memory were "very depressed." (Tr. 113). He was reading below grade level and could be disruptive in the classroom. He was described as having little self-confidence in peer relationships and academics. He was enrolled in a resource program for the learning disabled. See Tr. 106 (background information).

---

[3]This represented a decline from 1972 when he scored a Verbal IQ of 111, Performance IQ of 124, and Full Scale IQ of 119. (Tr. 111).

The Special School District completed a re-evaluation in 1983 when plaintiff was in the eleventh grade. (Tr. 106-09). It was determined that he had processing deficits in the areas of auditory memory and motor integration with academic weaknesses in reading and written language. Nonetheless, his speech and language development were found to be within age expectancy and his motor coordination was not "an area of concern" with the exception of poor handwriting. He was functioning adequately in all academic areas and interacted well with teachers and other authority figures. Plaintiff was described as conscientious in the extreme, and he was noted for taking personal initiative and demonstrating adequate time management skills. His good performance was attributed to "persistent and responsible work habits" and the resource support he received. (Tr. 109).

Plaintiff was evaluated on June 6, 1985, by Herbert R. Berger, a licensed psychologist. (Tr. 133-37). Mr. Berger administered several tests, including the Weschler Adult Intelligence Scare – Revised (WAIS-R). Plaintiff's scores on this test indicated he was functioning in the "lower reaches of the 'dull' normal intellectual range." However, plaintiff missed a number of "easy items" while successfully completing a number of more difficult ones. If credited with the missed items, plaintiff's IQ rose closer to the middle of the normal intellectual range. Plaintiff had short-term auditory memory problems that interfered with his ability to organize ideas and remember lists of items in a series. His ability to concentrate was impaired due to both internal and external distractions and he had trouble controlling his impulses. Mr. Berger diagnosed plaintiff with attention deficit disorder with hyperactivity and developmental reading disorder. The "eroding effects of attention deficits [were] quite noticeable [and] encroach[ed] upon cognitive functioning." (Tr. 136). Mr. Berger

opined that plaintiff "need[ed] a work environment which has a very high action component to it and a very low attending and concentrating component, [for example d]igging ditches . . . Even in digging ditches he would have to be in a structured environment with fairly close supervision." (Tr. 137).

Plaintiff attended the University of Missouri-Columbia for one year and took a full course load. See Vocational Analysis Report (Tr. 120-25). He reported that he managed his basic math class without difficulty but felt overwhelmed by a political science class that required extensive reading. He was placed on academic probation in his second semester. (Tr. 121). It was thought that his poor academic performance was due to his taking a heavy course load without accommodation for his learning disabilities; he also worked while attending school. (Tr. 120).

Plaintiff underwent a two-week assessment at the Metropolitan Employment and Rehabilitation Service in August 1986. (Tr. 120-25). He expressed interest in a career in computer programming. Plaintiff displayed auditory perceptual problems and had difficulty with auditory and visual memory. He also had difficulty with concentration, although it was noted that he performed well on many activities that required attention to detail. His fine motor speed was poor. Plaintiff's scores on intelligence tests were within the average range of intellectual ability. Tests of specific areas of cognitive functioning indicated that plaintiff had deficits in several areas, including writing, reading, and aspects of auditory perception and oral motor skills. (Tr. 123). Psychological inventories did not indicate any serious psychopathology. His performance on tests of mechanical comprehension fell within the fifth percentile of industrial employees and the sixtieth percentile of 12th graders at a technical high school. Plaintiff was described as "pleasant and cooperative" and was punctual and

well-groomed.  He worked in a persistent manner and became more open and talkative in the course of the two-week evaluation.

Plaintiff graduated from a one-year computer studies program at the Bryan Institute in April 1987.  He received "A's" in several courses, including accounting and basic and COBOL programming.  (Tr. 119).

The record contains a letter of reference dated April 28, 1987, written by Franke Arcand, a counselor with Vocational Rehabilitation.  (Tr. 169).  Ms. Arcand described plaintiff as a "first-rate worker" and "an excellent and reliable employee."  She noted that plaintiff participated in a class on interpersonal skills in addition to completing the Bryan Institute program.  Ms. Arcand stated that,, with "true grit" and encouragement from his family, plaintiff had successfully attained his vocation and training goal.

Jean Jose, Ph.D., completed a psychological evaluation in January 15, 1991, to determine plaintiff's eligibility to participate in programs offered by Vocational Rehabilitation.  (Tr. 146-49).  His scores on the WAIS-R fell within the low average range of intelligence, although Dr. Jose opined that his score was adversely affected by learning disabilities and that his actual functioning was within the normal range.  As in earlier evaluations, plaintiff's high level of distractibility interfered with his performance and he continued to display difficulty controlling his impulses.  He had deficits in language and numerical facility and had problems involving his short-term auditory memory. Plaintiff's scores on the Minnesota Multiphasic Personality Inventory (MMPI) indicated that he had an excess of energy, and could be talkative, distractible, and restless.  Dr. Jose gave plaintiff diagnoses of developmental language disorder and developmental expressive writing disorder.

Plaintiff participated in a career placement program offered by Missouri Goodwill Industries in August 1991.  (Tr. 142-43).  He expressed interest in computer programming or operation and was assigned to work with various specialists in these fields.  He was provided one-on-one assistance and participated in mock interviews.  The specialists all expressed concern about his skill level and his inability to answer questions in an interview setting.

Plaintiff participated in the "Work Station in Industry" program from January 6th through February 28th, 1992.  (Tr. 140-41).  According to the final report, plaintiff entered the program with the goal of being a dietary aide.  Plaintiff was punctual and courteous and kept all appointments throughout the program.  The employment specialist completed applications for plaintiff because his handwriting was illegible.  He interviewed well and was hired at a nursing home.  He completed his first week without any employer complaints.  During the second week, however, the employer expressed concerns regarding plaintiff's grooming, production and attitude.  The employment specialist provided plaintiff with a list of specific duties and educated the employer regarding his learning disabilities.  In addition, plaintiff worked with a job coach for two weeks, after which the employer reported improvement in his grooming and production.  The employer requested the chance to work with plaintiff without a job coach.  Despite extraordinary efforts by the employer over the next two weeks, plaintiff was terminated.  It was agreed that he "tried his best" but that his disability prevented him from meeting the employer's expectations.

Joseph Shuman, M.D., completed a psychiatric evaluation of plaintiff on September 2, 1993.  (Tr. 156-58). Plaintiff, who was 26 at the time, was driven to the interview by his girlfriend.  He reported that he lived in an apartment and spent his

time seeking work.  He stated that he is shy in interviews and does not get hired.  Dr. Shuman noted that plaintiff spoke in a low voice but made good eye contact.  He was coherent and logical but there was "no spontaneity."  Plaintiff displayed no evidence of a thought disorder and he was well oriented in all spheres.  He was "surprisingly" slow in completing simple counting calculation problems.  Plaintiff reported that he got along well with others.  Dr. Shuman opined that plaintiff could maintain the attention required to do simple repetitive tasks and could withstand the stress and pressures of an ordinary job.

Donald T. Cross, Ph.D., administered the WAIS-R to plaintiff on September 2, 1993.  (Tr. 159-61).  Plaintiff appeared reserved and uncomfortable and showed little spontaneous speech.  He understood instructions readily and had a methodical and orderly approach to the assessment tasks.  The scores were thought to be an accurate estimate of his current functioning.  Plaintiff demonstrated significant weaknesses in auditory memory, computational skills, judgment and common sense, analysis and synthesis of visually presented material, long-term visual memory, and nonverbal concept formation and spatial visualization.  Overall, plaintiff's intellectual functioning was within the borderline range.  Dr. Cross noted that across repeated testing his IQ scores progressively declined.  Individuals with similar scores functioned best in unskilled or semiskilled work with a focus on concrete and repetitive tasks.  Supervision was usually necessary except for tasks that were well-practiced.

Michael Gottfried, Ph.D., completed a consultative evaluation of plaintiff on August 11, 2008.  (Tr. 279-84).  Plaintiff stated that he had been diagnosed with learning disabilities in kindergarten and had difficulty with reading and writing. Plaintiff reported that he had had two long-term girlfriends, each lasting for about 10 years,

with the latter relationship ongoing. He lived alone in an apartment and received financial support from his family and girlfriend. He stated that he arose around 8:00 in the morning, and went online to search for jobs. He then spent several hours watching television and swimming. He spent time with a high-school friend in addition to his girlfriend. He completed all his own household tasks. Dr. Gottfried observed that plaintiff was very reserved but pleasant during the interview and demonstrated "a great deal of cooperation." His concentration remained consistent throughout the evaluation and his attention was well-focused. He did not appear distracted and did not need items repeated. He made three errors in completing twelve simple calculations and could not subtract serial 7s from 100. Based on the interview and a record review, Dr. Gottfried opined that plaintiff was functioning in the low average to borderline range of intellectual functioning. His ability to work was affected by his history of reading and writing disabilities. In addition, his difficulty with social communicating affected his abilities to search for a job, interview, and handle conflict in the work setting. Dr. Gottfried opined that, "with ongoing support and assistance, he may be able to function well in a low or unskilled job that does not require reading or writing." Dr. Gottfried assigned plaintiff a Global Assessment of Functioning (GAF)[4] score of 49.[5]

---

[4]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[5]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

Kenneth Burstin, Ph.D., completed a Psychiatric Review Technique Form on August 15, 2008. (Tr. 286-301). Among the materials Dr. Burstin reviewed were letters submitted to the Employment Security Office. These letters indicated that plaintiff worked well when left alone but had problems with being disrespectful to supervisors. Dr. Burstin noted that he gave significant weight to Dr. Gottfried's assessment because he was a specialist, his evaluation was recent, and it was based on historical evidence and objective observations. Based on his review, Dr. Burstin found that plaintiff had the medically determinable organic mental disorder of learning disabilities in the areas of reading and written expression. Dr. Burstin opined that plaintiff had moderate limitations in the domains of daily living activities and social functioning and mild limitations in maintaining concentration, persistence or pace. In addition, plaintiff had moderate limitations in the ability to understand, remember and carry out detailed instructions, interact appropriately with the public, and maintain appropriate grooming.

### III.  The ALJ's Decision

In the decision issued on December 22, 2009, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2013.

2. Plaintiff has not engaged in substantial gainful activity since April 8, 2009, the alleged date of onset.

3. Plaintiff has the following severe impairments: reading disorder and disorder of written expression.

4. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform the full range of work at all exertional levels, with the following nonexertional limitations: he retains the capacity to acquire and retain at least simple instructions and to sustain concentration and persistence with at least simple, repetitive tasks. He can relate adequately to others in settings that do not require frequent public contact or unusually close interaction. He can adapt to changes in noncomplex work environments.

6. Plaintiff is able to perform his past relevant work as a store laborer stocking shelves.

7. Plaintiff has not been under a disability, as defined in the Social Security Act, from April 8, 2009, through the date of the decision.

(Tr. 10-15).

## IV. Discussion

To be eligible for disability insurance benefits, a claimant must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the

claimant is so engaged, he is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment meets or equals one of the listed impairments, he is disabled under the Act.  Fourth, the ALJ determines whether the claimant can perform his past relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy.  If the claimant is not, he is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

### B.  Plaintiff's Allegations of Error

Plaintiff contends that the ALJ: (1) improperly determined his residual functional capacity (RFC); and (2) failed to complete a function-by-function analysis of his past relevant work.

#### 1.  The ALJ's RFC Determination

The ALJ determined that plaintiff has the residual functional capacity to perform the full range of work at all exertional levels with nonexertional limitations: he retains the capacity to acquire and retain at least simple instructions and to sustain concentration and persistence with at least simple, repetitive tasks.  He can relate adequately to others in settings that do not require frequent public contact or unusually close interaction.  He can adapt to changes in noncomplex work environments.

The Social Security Administration has stated that "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2.  A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations."  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted).  "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  Id. (citation omitted).  "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant."  Id.  Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the

Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

### The ALJ's Credibility Determination

In reaching his RFC determination, the ALJ stated that plaintiff's allegation regarding the degree of limitation caused by his impairments was not entirely credible. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). The courts will defer to an ALJ's credibility finding if the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (citation omitted).

The ALJ noted that plaintiff does not take any medication or receive treatment for his impairments. In addition, he noted that plaintiff spends a part of each day looking for a job and submitting resumes online; these are activities that are inconsistent with an inability to work. Furthermore, plaintiff is able to complete the ordinary activities of daily living, including cooking, cleaning, doing laundry, grocery shopping, banking, paying bills, keeping a checkbook, reading the newspaper, watching television, and playing video games. He maintains social relationships with a long-term

girlfriend and a high school friend.  It is significant that plaintiff worked for a number of years, and there is no allegation or evidence that his condition deteriorated since he stopped working.  The fact that he was able to work in the past with the same allegedly disabling impairments is inconsistent with a finding of disability in the present.  Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) (noting that plaintiff worked for four years with symptoms she now claimed were disabling); Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (conditions not disabling in the present where plaintiff worked for three years after stroke and there was no evidence of deterioration in her condition).  The ALJ's credibility determination was adequately supported by citations to evidence in the record.  See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (finding no error in ALJ's credibility determination where ALJ noted lack of treatment, ability to perform household chores, and engage in recreation).

### "Some" Medical Evidence

Plaintiff argues that the ALJ's RFC determination is not supported by "some" medical evidence as required by the Eighth Circuit's opinions in Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001).  Plaintiff's reliance on these cases is misplaced.  In Lauer, the ALJ substituted his own lay opinion for that of medical experts.  Id. at 703-04.  There is no allegation that the ALJ in this case committed this error.  Singh involved a challenge to the weight the ALJ gave to a treating physician's opinion.  Singh, 245 F.3d at 452.  The record in this case does not include the opinion of a treating physician.

Plaintiff first argues that the ALJ improperly rejected Dr. Gottfried's assessment that his GAF is 49, which indicates a severe limitation in functioning.  The ALJ determined that this GAF score was inconsistent with the record as a whole and with

Dr. Gottfried's own findings.  As the ALJ correctly noted, no physician opined that plaintiff was disabled or incapable of work; indeed, Dr. Gottfried stated that plaintiff would be capable of working in a semiskilled or unskilled setting with support. Furthermore, a GAF score of 49 is inconsistent with plaintiff's description of his own daily activities.  Plaintiff's argument that the ALJ failed to give Dr. Gottfried's opinion proper weight is meritless.  See SSR 96-2P, 1996 WL 374188 (July 2, 1996) (even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record.).  The ALJ's RFC determination is supported by substantial evidence in the record.

### 2.   Past Relevant Work

The ALJ determined that plaintiff could return to his past relevant work as a store laborer stocking shelves, both as he performed it and as it is generally performed in the national economy.  (Tr. 14).  Plaintiff argues that the ALJ's determination is improper because he failed to complete a function-by-function analysis as required by Pfitzner v. Apfel, 169 F.3d 566 (8th Cir. 1999).  Under Pfitzner, the ALJ must make specific findings as to the claimant's limitations and the effect of those limitations on the claimant's residual functional capacity.  Id. at 568.  The ALJ should then "make explicit findings regarding the actual physical and mental demands of the claimant's past work."  Id. at 569 (quoting Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991)).  The ALJ may discharge this duty by referring to the specific job descriptions in the Dictionary of Occupational Titles that are associated with the claimant's past work.  Id.

In this instance, an agency examiner determined that plaintiff's past work as a store laborer stocking shelves was within the Dictionary of Occupational Titles (DOT)

classification 922.687-058.  (Tr. 46).  According to the DOT, this work is simple, repetitive, and has little or no public interaction.  Id.  Thus, the shelf stocker job as previously performed by plaintiff falls within his RFC.  The ALJ adopted the examiner's findings as expert opinion.  (Tr. 14).  Although the ALJ did not make explicit findings regarding the demands of plaintiff's past relevant work and compare those demands with his RFC, the Court finds that the error did not prejudice plaintiff.  See Samons v. Astrue, 497 F.3d 813, 821-22 (8th Cir. 2007) (declining to remand matter for further proceedings on past relevant work where DOT classification made clear that past relevant work met plaintiff's RFC).

V.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#14] is **denied**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 6th day of August, 2012.